**SO ORDERED.**

**SIGNED this 22nd day of April, 2021.**



Mitchell L. Herren
United States Bankruptcy Judge

---

**PUBLISHED**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

IN RE:

**RANDY L. ROBINSON**

        **Debtor.**

Case No. 20-11471
Chapter 11

## ORDER DENYING UNITED STATES TRUSTEE'S <u>MOTION TO DISMISS FOR CAUSE</u>

The United States Trustee (UST) filed a motion to dismiss debtor's Chapter 11 Subchapter V small business case for cause, citing gross mismanagement of the estate by debtor's post-petition, pre-confirmation gambling under 11 U.S.C. § 1112(b)(1) and (b)(4)(B). Debtor played slot machines and lost $4,000 during the month after he filed his bankruptcy case. The motion is denied because this did not constitute gross

1

mismanagement under the circumstances here, and because where debtor

gambled post-petition income from his salary prior to confirmation, that

salary was not property of the estate in this Subchapter V case.[1]

Jurisdiction

A motion to dismiss a chapter 11 case for cause arising under 11 U.S.C.

§ 1112(b) concerns the administration of the case and is a core proceeding

over which this Court has subject matter jurisdiction.[2]

Findings of Fact

A. Background and Confirmation of Robinson's Amended Plan
and Related Plans

Debtor Randy Robinson and debtor Ricky Brock, in a separate

Subchapter V small business case, own and operate a funeral home business,

Countryside Funeral Home, LLC, each holding one-half of the membership

units of Countryside. Robinson is the managing member of the limited

liability company. Countryside operates in Fredonia, Kansas and in several

nearby communities in southeast Kansas. Robinson and Brock personally

guaranteed a Countryside loan from Live Oak Banking (the Bank), the

primary secured lender of Countryside. As a result of expanding its

---

[1] The United States Trustee, Ilene J. Lashinsky, appeared by Christopher T. Borniger. The debtor Randy L. Robinson appeared in person and by his attorney Mark J. Lazzo. The Subchapter V trustee Rob Messerli also appeared.
[2] *See* 28 U.S.C. § 157(b)(2)(A); 28 U.S.C. §§ 157(b)(1), 1334, and Amended Standing Order of Reference, D. Kan. S.O. 13-1 (June 24, 2013).

2

operations too quickly, Countryside's mortgage payment owed to the Bank had increased $5,000 between 2014 and 2020. It also incurred substantial real estate and priority tax liabilities for unpaid FICA and FUTA taxes.

On March 16, 2020 Countryside filed a Chapter 11 case in this division to reorganize its debts and downsize its operations, continuing to operate the business as the debtor-in-possession.[3] Countryside filed its initial disclosure statement and plan of reorganization on September 11, 2020 and after the Bank objected, filed an amended disclosure statement and plan of reorganization on October 22, 2020. The Court confirmed Countryside's amended plan of reorganization on December 11, 2020 and entered the final decree on February 3, 2021. At confirmation, the Bank held a secured claim of approximately $1.2 million and an unsecured claim of some $1.9 million.

As Countryside neared confirmation of its plan, Messrs. Brock[4] and Robinson[5] filed individual Chapter 11 cases under Subchapter V of the Small Business Reorganization Act on December 2, 2020. They each remained as debtors in possession. Separate Subchapter V trustees were appointed in each case. Their personal bankruptcies were driven by their personal guarantees of the Bank's loan and several years of unpaid income taxes. The

---

[3] Case No. 20-10330.
[4] Case No. 20-11470.
[5] Case No. 20-11471.

3

two largest creditors in both cases are the Bank, who has an unsecured claim in excess of $1.9 million for Brock's and Robinson's personal guaranty of the Countryside loan obligations, and the Internal Revenue Service and state taxing authorities, who have substantial secured, priority, and unsecured tax claims for unpaid income taxes and penalties for years 2015-2019.

Brock and Robinson filed similar plans of reorganization on February 19, 2021. They filed amended plans on March 1, adding article 9 to address discharge.[6] Both plans were duly noticed on March 2 with deadlines to object to confirmation and to vote to accept or reject the amended plans, setting a confirmation hearing for the first week in April.

In Robinson's case, no creditors objected to confirmation of his amended plan. No creditors voted to accept or reject the plan.[7] One day prior to the objection deadline, the United States Trustee (UST) filed an objection to confirmation asserting under § 1129(a)(3) that Robinson's plan was not proposed in good faith on the basis that he "concealed prolific gambling" pre- and post-petition.[8] Confirmation of the Robinson and Brock plans were heard at a video confirmation hearing on April 7, due to the COVID pandemic.

---

[6] Brock case, doc. 41; Robinson case, doc. 44.
[7] Robinson case, doc. 62.
[8] Doc. 57.

4

Brock's amended plan was confirmed as consensual.[9] The Court's ruling on confirmation of Robinson's amended plan will be addressed in a separate order, at which time the Court will discuss the relevant evidence and confirmation issues in more detail.[10]

### B. Robinson's Post-petition Gambling and the UST's Motion to Dismiss for Cause

As noted above, Robinson filed his Subchapter V case on December 2, 2020.[11]  He remained in control of the property of the estate and continued to operate his business as the debtor-in-possession. Countryside pays Robinson a monthly salary of about $6,500.[12] Rob Messerli was appointed the Subchapter V trustee pursuant to § 1183(a). Robinson appeared before the UST for a § 341 meeting of creditors on December 29, 2020. He provided his 2018 and 2019 tax returns to the UST.[13] Because Mr. Messerli did not attend the meeting it was continued to January 13, 2021 to allow him to review the recording of the meeting and ask any questions he had for Robinson. Messerli

[9] *See* § 1191(a). The UST agreed that Brock's plan was a consensual plan, though only a single unsecured creditor cast an accepting ballot. *See* Brock case, doc. 49.  The confirmation order was entered on April 19. Doc. 57.

[10] Due to the 15-day time constraint on deciding the motion to dismiss under § 1112(b)(3), and the potential for dismissal of the case, the Court determined that it would consider the UST's motion to dismiss separately and issue this Order first.

[11] Robinson amended his petition the next day to elect Subchapter V of Chapter 11. *See* Doc. 9.

[12] In December 2020, Robinson was being paid $3,009 bi-weekly by Countryside, which calculates to $6,519 per month. *See* Trial Ex. 4. That figure is consistent with Robinson's monthly take-home pay as reported on Schedule I. *See*  Doc. 1, pp. 35-36.

[13] Trial Ex. 1 and 2.

**5**

had no follow-up after his review and the meeting was concluded on January 13. The Court convened an initial status conference pursuant to § 1188(a) on January 21, at which the UST and trustee Messerli appeared and raised no concerns. Debtor's counsel advised that the plan would be timely filed and would be a consensual plan.[14] The Court set the scheduling deadlines in the case and it was continued to March 18 for the next status conference.

On January 27, Robinson filed his December 2020 monthly operating report.[15] He disclosed "casino" entries on the cash receipts and cash disbursements schedule. He attached his checking account statement from FirstOak Bank dated January 3, 2021 to the report. That statement disclosed a series of post-petition withdrawals for the "Ramona Casino" in Ramona, Oklahoma in the amount of $2,003 twice on December 22, and $2,003 twice on December 31. Robinson testified that he played slot machines with the $8,000 and lost $4,000. He deposited the remaining $4,000 back into the account.

The December 2020 operating report triggered an e-mail inquiry by the UST to debtor's counsel on February 10 regarding the Ramona casino transactions.[16] Debtor's counsel responded on February 16 explaining that the majority of the funds were used to gamble on slot machines and net funds

---

[14] *See* Doc. 24, Debtor's Subchapter V Status Report pursuant to § 1188(c).
[15] Doc. 36 (admitted at trial as Trial Ex. 4).
[16] Trial Ex. A.

**6**

of $4,000 were deposited back into the account on December 30, 2020. The UST then replied that debtor's 2018 and 2019 tax returns showed gambling income and offset "expenses," and questioned Robinson's answer to question 15 on the statement of financial affairs (SOFA) that he had no gambling losses in 2020. Debtor's counsel again followed up with Robinson who advised on February 26 that his 2020 tax return "will show $95,930.50 gambling income and offset expenses."[17]

That same day, counsel instructed his staff to prepare an "amendment to schedules" to disclose the gambling losses for 2020. A month later, Robinson's amended response to question 15 on the SOFA reflecting the 2020 gambling loss was filed.[18] The amendment did not amend Robinson's SOFA answers to questions 4 or 5.

On March 18, at a previously scheduled status conference, the UST announced that it had just that morning filed a motion to dismiss the case for cause under § 1112(b), claiming Robinson "gambled more than $14,000 in estate funds and lost most of it" in his first month as a Chapter 11 debtor, constituting gross mismanagement of estate funds.[19] The quoted statement was not entirely accurate because the gambling encompassed both pre-petition and post-petition gambling activity.

---

[17] *Id.*
[18] Doc. 58.
[19] Doc. 49.

7

Robinson objected to dismissal.[20] He pledged not to gamble while in Chapter 11 and noted that in any event he would not have income to gamble due to the substantial plan payments he would have upon confirmation of his plan.[21] On March 30, the UST filed its lack of good faith objection to confirmation of debtor's amended plan, based upon Robinson's alleged concealment of pre- and post-petition gambling.[22]

None of Robinson's creditors joined in the UST's motion to dismiss or objected to confirmation. None appeared for the evidentiary hearing. Since the UST's motion to dismiss was based on the same gambling activity and disclosures by Robinson as raised in the UST's objection to confirmation, the Court set both matters for evidentiary hearing on April 7. At the hearing, the UST, Subchapter V trustee, and Robinson all agreed to present the evidence relating to confirmation, the UST's objection to confirmation, and the UST's motion to dismiss simultaneously.

Robinson is single with no dependents. He is the funeral director for Countryside. He considers himself a recreational gambler. He frequents a casino in Ramona, Oklahoma, about an hour drive from his home, to play quarter slots, and has done so for several years. The Ramona casino does not

---

[20] Doc. 53.
[21] He estimated his monthly plan payments would be around $6,000, including not only his monthly payments to creditors but also administrative expenses, yet to be determined, of the Subchapter V trustee, his attorney's fees, and his accountant.
[22] Doc. 57.

8

offer table games. He denied that he was a professional gambler or that he gambled privately.[23] Robinson used his salary from Countryside to gamble and the Court heard no evidence that he gambled pre- or post-petition with Countryside assets. Robinson denied that he filed bankruptcy because of gambling.[24]

Robinson's tax returns are prepared by his accountant. He provided to his accountant W-2G Forms of his gambling winnings.[25] On his 2018 federal tax return, Robinson reported prepetition gambling income from "W-2G" of $250,234 and the same number on itemized deductions for gambling losses.[26] On his 2019 federal tax return, he reported gambling income from "W-2G" and deducted gambling losses, both in the amount of $185,674.[27] Robinson testified incredibly that his actual losses exactly *equaled* his winnings in both years, as well as in 2020. The Court is dubious of this claim, but otherwise found debtor's testimony to be credible and forthcoming. He did not state, nor was he asked, whether he kept records of his losses, what those records were, and whether he supplied loss records to his accountant. He was very clear

---

[23] When asked on direct examination if he had any casino markers, Robinson said he did not know what a marker was.

[24] The Ramona casino was not scheduled as a creditor.

[25] The casino issues a Form W-2G if the gambler receives $1,200 or more in winnings from slot machines. It is reported as "other income" on Schedule 1 (Form 1040). Gambling losses can be deducted as an itemized deduction, but only to the extent of winnings. *See* https://www.irs.gov/forms-pubs/about-form-w-2-g (last viewed April 14, 2021).

[26] Trial Ex. 1, p. UST000008, line 21, and p. UST000011, line 16.

[27] Trial Ex. 2, p. UST000071, line 8, and p. UST000072, line 16.

9

that he provided the Form W-2Gs to his accountant and the tax returns themselves support that.

There were repeated references by counsel during the hearing about how the tax code does not allow deductions for gambling losses in excess of winnings. The Court suspects that Robinson's testimony about his winnings equaling his losses was simply a recognition that the tax code did not allow him to claim or deduct gambling losses in excess of gambling winnings.[28] In any event, the gambling income was completely offset, resulting in much less taxable income.[29] Regardless, the salient point is that Robinson reported prepetition gambling on his 2018 and 2019 tax returns and provided those returns to the UST as part of the § 341 process.

At trial, Robinson testified that he did not intend to hide his gambling, and was unaware he could not gamble post-petition until the issue arose after he filed his December operating report. He was not told by the UST at the § 341 meeting that gambling was prohibited while in bankruptcy, despite the fact that he had provided two years of tax returns, showing his gambling winnings and losses. Robinson pledged not to gamble while in Chapter 11 and offered to increase payments to the general unsecured creditor class by the

---

[28] *See* 26 U.S.C. § 165(d).
[29] For 2018, Robinson's taxable income was $133,556. Trial Ex. 1, p. UST000007, line 10. For 2019, Robinson's taxable income was $92,808. Trial Ex. 2, p. UST000069, line 11b.

**10**

$4,000 lost gambling post-petition in December. He testified he has neither been to the Ramona casino, nor gambled since December.

The only other witness called at the April 7 hearing was Mr. Messerli, the Subchapter V trustee. Messerli did not know of Robinson's gambling activity until the December operating report was filed. He believed gambling poses a "significant risk," and that past gambling is material to Robinson's ability to carry out the plan, because gambling can be addictive. Messerli conceded that was his "belief," and he had no evidence that Robinson had an addiction. Messerli didn't talk to Robinson's creditors about the gambling, and he did not conduct any investigation of Robinson's gambling activity or management of his financial matters after the gambling came to light or after the UST filed its motion to dismiss. On cross-examination, Messerli admitted that the plan was feasible and that Robinson deserved a chance to try to perform his plan, provided an additional $4,000 would be paid to the class of unsecured creditors to cover the post-petition gambling loss.

Analysis

A. Does Cause Exist to Dismiss the Case?

The UST, as the movant, bears the burden of proving by a preponderance of the evidence that cause exists for dismissal.[30] Upon a

---

[30] *In re Woodbrook Associates,* 19 F.3d 312, 317 (7th Cir. 1994) (citations omitted); *In re Sunnyland Farms, Inc.,* 517 B.R. 263, 266 (Bankr. D. N.M. 2014).

11

showing of cause, § 1112(b)(1) provides that the Court shall dismiss the case or convert it to Chapter 7, whichever is in the best interests of creditors and the estate.[31] The Court has broad discretion in determining whether to dismiss or convert, but is governed by the statute's best interests test.[32] Whether cause exists is a threshold issue.[33]

1. Was There Gross Mismanagement of the Estate?

"Cause" is not specifically defined by the Bankruptcy Code. The current version of § 1112(b)(4) enumerates some sixteen causes for dismissal, though the list is not exhaustive and gambling is not among them.[34] Where, as asserted here by the UST, the alleged cause is gross mismanagement *of the estate* under subpart (b)(4)(B), the gross mismanagement must occur post-petition.[35] Bankruptcy courts evaluate the grounds constituting "cause" for materiality.[36]

---

[31] Section 1112(b)(1) applies to Subchapter V cases filed under the Small Business Reorganization Act of 2019 (SBRA), 11 U.S.C. §§ 1181-1195. *See* § 1181(a) (noting Bankruptcy Code provisions that do not apply in Subchapter V cases).

[32] *In re Woodbrook Associates,* 19 F.3d 312, 316 (bankruptcy court not required to consider alternatives to dismissal or conversion). *Hall v. Vance,* 887 F.2d 1041, 1044 (10th Cir. 1989) (broad discretion standard).

[33] *In re Sunnyland Farms, Inc.,* 517 B.R. 263, 266.

[34] *Hall,* 887 F.2d 1041, 1044; *Frieouf v. United States (In re Frieouf),* 938 F.2d 1099, 1102 (10th Cir. 1991), *cert. denied,* 502 U.S. 1091 (1992).

[35] *Sunnyland Farms, Inc.,* 517 B.R. 263, 267; *In re Rent-Rite Super Kegs West Ltd.,* 484 B.R. 799, 809 (Bankr. D. Colo. 2012) (pre-petition gross mismanagement is not cause because the estate is a post-petition entity).

[36] *Sunnyland Farms, Inc.,* 517 B.R. at 266-67 (citing *In re Melendez Concrete Inc.,* No. 11-09-12334 JA, 2009 WL 2997920, at *5 (Bankr. D. N.M. 2009)).

12

Here, the UST asserts gross mismanagement based on Robinson's excursion to the Ramona, Oklahoma casino to play slots in late December 2020, where debtor lost $4,000.[37] That gambling trip occurred postpetition and may be cause for dismissal if it otherwise constitutes gross mismanagement of the estate. It should be emphasized that because there is no bankruptcy estate prior to filing, the gross mismanagement claim cannot be based on Robinson's pre-petition gambling or Robinson's unpaid income tax liabilities that accrued pre-petition. Neither of those are relevant to the for-cause motion to dismiss.[38]

In *In re Sunnyland Farms, Inc.* the bankruptcy court addressed a for-cause motion to convert on several grounds, including gross mismanagement of the estate. With respect to gross mismanagement of the estate the court stated:

> There is no evidence of mismanagement, let alone gross mismanagement, post-petition. Since bankruptcy proceedings began, Debtor has timely filed all monthly operating reports and has drafted and filed a plan of reorganization. Prudent management dictates that insurance be in place if possible, but here the estate has no money with which to pay insurance premiums. The Court finds that Petitioning Creditors have failed to prove post-petition gross mismanagement as specified in § 1112(b)(4)(B).[39]

---

[37] Doc. 49.
[38] *Sunnyland Farms, Inc.,* 517 B.R. 263, 268 (stating that unpaid prepetition taxes are not relevant in the cause analysis).
[39] *Id.* at 267.

13

Finding no cause, the *Sunnyland* court denied the motion and allowed the case to proceed toward confirmation.[40]

Robinson has negotiated plan treatment with his primary creditors. He provided his tax returns to the UST. He has appeared for status conferences. He filed his plan and amended plan prior to the statutory 90-day deadline. He has prepared and filed his monthly operating reports. A confirmation hearing was held April 7. He continues to work as funeral director and operate Countryside.

Cases where cause has been found to dismiss or convert for gross mismanagement are very different from the case here. In *In re ARS Analytical, LLC* the creditor established cause to convert based in part on gross mismanagement of the estate. In that case, the debtor's chief operating officer was not involved in and did not have a good grasp of the day-to-day activities or operation of the company; he was only at the office one day per month and delegated his duties without following up. Debtor could not determine its own financial condition.[41] In *Kingsway Capital Partners, LLC,* the bankruptcy court dismissed debtor's Chapter 11 case *sua sponte* for gross mismanagement where debtor's principal used debtor funds to pay personal expenses and several months into the case the nature of debtor's business

---

[40] *Id.* at 269.
[41] 433 B.R. 848, 864-65 (Bankr. D. N.M. 2010).

14

and source of debtor's income "remained elusive."[42] No evidence of this type was presented at the Robinson hearing.[43]

    2.  Does Post-petition Gambling Constitute Gross Mismanagement?

The UST says it does. It cites *In re Draiman* for this proposition.[44] *Draiman* was an individual Chapter 11 case where the debtor engaged in post-petition gambling and a creditor filed a motion to dismiss for cause under § 1112(b), but that is where the similarity ends. The *Draiman* court addressed the motion to dismiss for cause in three pages of the 51-page opinion.[45] The motion to dismiss for cause was not based on post-petition gambling or gross mismanagement under § 1112(b)(4)(B). The creditor's motion alleged two grounds of cause: failure to timely pay post-petition taxes and file post-petition tax returns pursuant to § 1112(b)(4)(I); and unexcused failure to timely satisfy any filing or reporting requirement under the Code pursuant to § 1112(b)(4)(F). Neither cause had anything to do with post-petition gambling.

---

[42] 549 B.R. 897, 904-05 (N.D. Cal. 2016).
[43] *See also In re Creech,* 538 B.R. 245, 251 (Bankr. E.D. N.C. 2015) (no gross mismanagement by debtors, operators of a greenhouse wholesale business, where nothing in record indicated debtors took actions outside ordinary course of business, such as paying prepetition debts or incurring debt without court approval, filing monthly reports without close examination, or ineffectiveness of current management.)
[44] 450 B.R. 777 (Bankr. N.D. Ill. 2011).
[45] *Id.* at 825-28.

15

The balance of the *Draiman* opinion addressed a creditor's multiple objections to confirmation of debtor's fourth amended plan. It addressed post-petition gambling in the context of an objection under § 1129(a)(3), which requires that the plan be proposed in good faith.[46] As noted earlier in this Order, the UST's good faith objection to confirmation is preserved and will be addressed separately in an opinion regarding confirmation of Robinson's amended plan to follow. In fairness to the UST's citation to *Draiman*, the Court's independent research has found few Chapter 11 "gambling" cases, probably because most Chapter 11 cases are not individual debtor cases. Those that do address gambling seem to arise in the context of confirmation objections, as in *Draiman*.

Robinson cites to an unpublished Tenth Circuit Bankruptcy Appellate Panel (BAP) Chapter 13 case that did involve a debtor's post-petition gambling, *In re Wilkins,*[47] but distinguishes it. The debtor appealed the dismissal of her case for gambling while in bankruptcy. At the outset, three key facts present in *Wilkins* are not present here. First, the confirmation order required debtor to report to the Trustee any events affecting disposable income that were not projected on Schedules I & J, and were received during

---

[46] *Id.* at 803-07.
[47] *Wilkins v. Hamilton (In re Wilkins),* No. KS-04-050, 2005 WL 1926413, 329 B.R. 358 (Table) (10th Cir. BAP Aug. 11, 2005)

**16**

the pendency of the case.[48] Second, at the § 341 meeting, the trustee instructed the debtor not to gamble during her case. Third, debtor's counsel was ordered to advise debtor that she "is not to expose her income to gambling," because any disposable income belonged to the bankruptcy estate.[49] The bankruptcy court dismissed the case under § 1307 after debtor gambled and then lied about it, committing perjury, and failed to devote all her disposable income to the plan. The dismissal was for an abuse of the provisions, purpose, or spirit of Chapter 13. On appeal, the debtor argued that post-petition gambling is not an abuse of Chapter 13, that it is not illegal to gamble in Kansas, and that it was improper for the trustee to investigate her gambling activity. The BAP affirmed the dismissal, stating:

> The use of budgeted recreation funds for gambling would ordinarily not, without more, constitute an abuse of the provisions, purpose, or spirit of Chapter 13. But in this case, there is more: the Debtor committed perjury. "Chapter 13 requires the debtor 'to be honest, forthcoming, truthful, and frank.' Whether the debtor has been forthcoming with the bankruptcy court and the creditors is properly considered in deciding whether dismissal for lack of good faith is appropriate." A bankruptcy court may dismiss a debtor's case because of perjury.[50]

Robinson did not budget recreation funds for gambling on Schedule J and testified at trial that he would no longer be gambling while in bankruptcy because after his plan payments begin, he would no longer have

---

[48] A confirmation order has not been entered in Robinson's case.
[49] 2005 WL 1926413, at *1.
[50] *Id.* at *3.

disposable income with which to gamble. Robinson received no admonitions against gambling post-petition. Though the 2018 and 2019 tax returns disclosed significant pre-petition gambling income and losses, the record does not show that the UST or the Subchapter V trustee cautioned Robinson against post-petition gambling. Nor did the UST request the Court to order the Subchapter V trustee to investigate debtor's post-petition gambling or alleged gross mismanagement. Among the duties of a Subchapter V trustee are the duty to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business . . . and any other matter relevant to the case or to the formulation of a plan" and "file a statement of any investigation . . . including any fact ascertained pertaining to . . . misconduct, mismanagement, or irregularity in the management of the affairs of the debtor . . . ."[51]

No evidence was presented that Robinson lied about his post-petition gambling. He disclosed it in his December operating report and promptly responded to the UST's inquiry about the Ramona casino transactions on the bank statement attached to the operating report. Robinson has not engaged in post-petition gambling since December of 2020. He has pledged not to

---

[51] *See* § 1106(a)(3) and (4), as made applicable to Subchapter V trustees by § 1183(b)(2).

18

gamble while in bankruptcy and he has offered to increase the unsecured creditor class distribution by the $4,000 lost gambling in December.

Importantly, there was no showing that the alleged cause for dismissal was in fact material. There was no showing of adverse impact to the estate or its creditors.

In sum, I am not persuaded that Robinson's post-petition gambling constitutes gross mismanagement and cause for dismissal on these facts. Even if Robinson's post-petition gambling somehow constituted gross mismanagement of the estate, dismissal is not in the best interests of creditors. Dismissal of Robinson's case could well negatively impact the successful completion of the plans of reorganization in the related bankruptcy cases of his partner Ricky Brock and the reorganization of the Countryside funeral business. Robinson continues to actively participate in the day-to-day operations of Countryside. There is no evidence Robinson is mismanaging Countryside. Brock and Robinson remain liable on the $1.9 million claim of Live Oak Bank for their personal guaranty of the Bank's claim. Both debtors' plans provide for payment on the Bank's unsecured claim, which together with taxing authorities' unsecured income tax claims, comprise the largest amount of claims in the class of general unsecured creditors.[52] Robinson's

_____

[52] In Robinson's case, the amount of the Live Oak Bank guaranty and unsecured tax claims are approximately $1,972,166 of the general unsecured class totaling approximately

amended plan provides for full payment of the secured claims and priority tax claims. Absent a plan of reorganization, those creditors would enforce their liens against Robinson's property and the unsecured creditors would likely be left with nothing for their claims.

No creditors apparently thought the December loss of $4,000 was material, and none opposed confirmation of Robinson's amended plan or voted to reject his amended plan. Nor did creditors oppose or reject Brock's or Countryside's amended plans; those plans have been confirmed. Robinson's amended plan is structured similarly to Brock's. There is a reasonable likelihood that a plan will be confirmed within a reasonable period of time in Robinson's case, too.

As for Robinson's $4,000 post-petition gambling loss, gambling in itself is not forbidden by the Bankruptcy Code and is a lawful activity in Kansas. After receiving the December operating report, neither the UST nor the Subchapter V trustee advised Robinson to cease further gambling. Robinson's 2018 and 2019 tax returns furnished to the UST in January also disclosed the extent of his gambling activity, yet the UST did not admonish Robinson. Nor did the UST advise Robinson at the § 341 meeting of creditors that he could not gamble while in bankruptcy. And as noted below, Robinson was not

$2,012,634. Under Robinson's amended plan, he proposes to pay a total of $18,000 to general unsecured creditors over three years.

gambling with estate assets or funds in December of 2020. Nor was there any evidence that he was siphoning funds from Countryside's estate to gamble.

Notwithstanding this sequence of events, Robinson has pledged to not gamble further while in bankruptcy and has offered to increase the distribution to the general unsecured creditor class by $4,000—the amount of the post-petition gambling loss. Though he hasn't yet amended his plan to so provide, these provisions can be addressed in a confirmation order. Those curative steps seem to provide some level of satisfaction to the UST and the Subchapter V trustee, as neither of them has sought to remove Robinson as the debtor-in-possession, and at trial, both agreed that if Robinson's amended plan is confirmed under § 1191(b), they had no reservation about Robinson serving as the disbursing agent.[53] The willingness of the UST and trustee to let Robinson continue to serve as the disbursing agent, instead of the Subchapter V trustee serving in that role, is inconsistent with an argument that Robinson has grossly mismanaged the estate to the point that the case should be dismissed.

---

[53] *See* § 1194(b) (providing that the Subchapter V trustee shall make payments to creditors under the plan unless otherwise provided in the plan or confirmation order).

### B. An Individual Subchapter V Debtor's Post-petition Earnings are not Property of the Estate Unless the Plan is Confirmed under § 1191(b)

As noted at the outset of this order, the cause of gross mismanagement requires gross mismanagement *of the estate.*[54] Though neither the UST, nor debtor have raised it, there is another reason the December 2020 post-petition gambling does not constitute gross mismanagement of the estate. This is an individual debtor Subchapter V small business case. A subchapter V debtor remains in possession of all property of the estate under § 1186(b). But property of the estate in an individual debtor Subchapter V case differs from an individual Chapter 11 case. It is defined by § 541, which does *not* include property acquired post-petition or earnings from services performed by the debtor post-petition. Section 1181(a) makes § 1115 inapplicable in a Subchapter V small business case.[55] That means in a Subchapter V case, an individual debtor's post-petition earnings are ordinarily not property of the estate.

Robinson's post-petition salary from Countryside was therefore not property of the estate, and when he gambled it could not constitute gross mismanagement *of the estate.* In addition, because Robinson's post-petition gambling occurred prior to confirmation of his amended plan, he was not

---

[54] § 1112(b)(4)(B). Emphasis added.
[55] Section 1115(a) defines property of the estate in an individual Chapter 11 case. Similar to § 1306 in Chapter 13, it includes earnings from services performed post-petition.

22

making plan payments at that time. It cannot be said that his gambling loss in December 2020 rendered him unable to perform his plan or make plan payments. However, debtor is cautioned. If the plan is confirmed as a nonconsensual plan under § 1191(b), then § 1186(a) provides that property of the estate includes property acquired post-petition and earnings from services performed by the debtor post-petition.[56] At this point, that has not occurred.

Conclusion

For all of the foregoing reasons, I conclude that Robinson's post-petition, pre-confirmation gambling did not constitute gross mismanagement of the estate. The UST has not met its burden proving cause for dismissal under these facts, and the motion to dismiss is therefore DENIED.

This is not to say that post-petition gambling can never be considered cause for dismissal in a Subchapter V case. Debtor should be strongly cautioned that had even a few facts here proven to be different, this motion could have been decided in a very different way. While gambling may be legal in some circumstances, it is in many circumstances both offensive to the integrity of the bankruptcy system and inconsistent with the duties owed by any fiduciary of the bankruptcy estate.

---

[56] Whether a plan that drew no rejecting ballots from creditors, but whose creditors all failed to return ballots can be considered a consensual plan, is a question the Court will address in its order regarding confirmation.

Debtor should also be strongly cautioned that if his amended plan is confirmed, his promise to abstain from gambling will almost certainly be carefully monitored by the Subchapter V trustee and the UST, with potentially serious consequences for any failure of debtor to keep his word. Not only would a failure of this case impact debtor, but it could also have serious, unintended consequences for the bankruptcy estates of his business partner and their company.

The Court expresses no opinion on confirmation of debtor's amended plan or on the UST's good faith objection under § 1129(a)(3). That will be addressed by a separate order.

### ###